SLAVENS v. NORTHERN PAC. RY. CO. [1]

(Circuit Court of Appeals, Ninth Circuit. October 2, 1899.)

No. 506.

1. WITNESSES—CONVERSATION WITH DECEASED PERSON—PARTY IN INTEREST.

Rev. St. U. S. § 858, provides that the law of the state in which the court is held shall determine the competency of witnesses in the courts of the United States. 2 Hill's Code Wash. § 1646, provides that, where a party sues or defends as a personal representative of a deceased person. then a party in interest or a party to the record shall not be admitted to testify in his own behalf as to any statement made to him by such deceased person. The evidence in an action against a railroad company to recover for the death of plaintiff's husband, who was killed by a landslide, showed that he was a section man on defendant's railroad, and that. with another section man, he was engaged in removing earth which had been deposited on the track, blocking the passage of a train, by a landslide from the bluff overhanging the track; that while so engaged, in answer to interrogatories of the conductor of the delayed train, he stated that there was danger of another landslide occurring at any time, that he had worked there before, and that they could expect another at any time. *Held*, that the conductor may testify to such statements, as he is not a party to the record or interested in the case.

2. CONVERSATION WITH DECEASED PERSON—RES GESTÆ.

Such conversation constituted a part of the res gestæ, and was relevant, as tending to show that decedent was informed of the danger to which he was exposing himself.

3. MASTER AND SERVANT—RAILROADS—RULES—DUTY OF CONDUCTOR.

In an action against a railroad company to recover for the death of plaintiff's husband, caused by his being swept off defendant's tracks into a river by a landslide, the evidence disclosed that he was one of defendant's section men; that, with another, he had been sent out to look for dangerous places in the track, liable to have been caused by the heavy rains which had fallen; that the landslide which swept him into the river occurred while he, under the direction of the conductor of a delayed train. and pursuant to a rule of the company requiring him to act under such conductor's direction. was removing a previous slide from the track. Plaintiff claimed that there was a hidden danger in the bank. *Held*, it was no part of the conductor's business to warn plaintiff of the hidden danger, merely because a rule of the company provided that section men

[1] Rehearing pending.

should, in case of accident or delay to a train, obey the orders of the conductor, especially where it was no part of the conductor's duty to know about the condition of the bluff, but the care thereof was in part intrusted to decedent.

**4. SAME—NEGLIGENCE—CONDUCTOR—SECTION MAN—FELLOW SERVANT.**

A section man working under the direction of a conductor of a delayed train in removing an obstruction from the track is a fellow servant with the conductor, and the company is not liable for injuries to one occasioned by the negligence of the other, though a rule of the company provides that section men shall always assist the passage of trains, and, in case of accident or delay, obey the orders of the conductor.

**5. SAME.**

The wife of a section man cannot recover from a railroad company for the death of her husband, who was swept from defendant's tracks into a river by a landslide, where the slide was caused by the failure of the crew, of which her husband was a member, to properly drain a bluff overhanging the track, where such duty was imposed on them by the rules of the company, as such failure is the negligence of fellow servants.

**6. SAME—ASSUMPTION OF RISK.**

Where section men on a railroad know that they constitute the usual force detailed for the performance of a particular duty, and during its performance they voluntarily expose themselves to a danger of which they should have known as much as any one, they are deemed to have assumed the risks incident to their situation, and cannot afterwards complain that there was not a sufficient force of men to do the work safely.

In Error to the Circuit Court of the United States for the Western Division of the District of Washington.

M. G. Munly, Jas. M. Ashton, and W. L. Sachse, for plaintiff in error.

Crowley & Grosscup, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge.    This action was brought in the court below to recover damages alleged to have been sustained by the plaintiff by the death of her husband, Charles Slavens, on December 7, 1896, by reason of the alleged negligence of the defendant company.    Deceased, Slavens, was a section hand in the employ of the railway company; performing the duty, at the time of his death, of track walker and night watchman.    One Antrim was the foreman of the section of the road on which the accident which caused Slavens' death occurred, and, on the evening of the accident, detailed, from the section men under his charge, Slavens and one Hughes to patrol it. Antrim had then had charge of this section for more than five years, and Slavens and Hughes had worked thereon about four years.    The night watchmen were usually sent out in pairs.    Hughes and Slavens had frequently been companions in the work, and had previously removed slides along different parts of the section.    These men were sent out on the road by the foreman in pursuance of general rules of the company, which provide:

"Rule 455. Roadmasters are responsible for the safety of track, good condition of roadbed, fences, right of way, and grounds, and neat and tidy appearance of stations, buildings, and surroundings.    They will frequently examine bridges, culverts, water stations, and other structures, and promptly report any defects or failure to superintend."

"Rule 460. Foremen and men in their employ must at all times hold themselves in readiness to aid the passage of trains, and, in case of accident or delay, will obey the orders of the conductors. (See rule 72.)

"Rule 461. Section foremen must pass over and examine their sections daily, and ascertain that the track, slopes, cuts, bridges, switches, etc., are safe, and make necessary repairs. This should be done in the morning.

"Rule 462. In case of extraordinary storms or high water, foremen must be out with their men, day and night, with proper signals, and watch those places most likely to damage, and take every precaution to prevent accident."

"Rule 472. The rounds of road watchmen or track walkers must be so arranged as to pass over their section in advance of passenger trains, when practicable. They will carefully examine the roadway, keeping a sharp lookout for broken rails, observe switches, try locks, and see that they are in proper order; see that cars clear the main track; examine buildings and other property, and protect the same from theft, fire, or other damage. Should an obstruction or anything occur that would be liable to endanger trains, the watchmen will at once, after leaving a red signal in the center of the track where obstruction occurs, proceed in the direction of the first expected train, and place torpedoes on the rail, as provided in rule 133. He will then protect the opposite direction in the same way, and then call his foreman, and send word to the nearest telegraph office."

"Rule 72. Six long blasts, repeated at intervals, is notice to trackmen and others that the train needs assistance; and all employés within hearing must repair at once to the engine or train, and render such aid as is in their power."

Slavens and Hughes were acting under these general rules at the time of the accident, which occurred in the evening of December 7, 1896, about three or four miles south of Castlerock, in the state of Washington, at which point the defendant's road is located between a high bluff and the Cowlitz river. The bank of the road at that place is from 40 to 60 feet high, with a slope of about 45 deg., and is covered with a heavy growth of brush and undergrowth. On the opposite side of the railroad track, and very near it, is the bank of the river. The river at the time of the accident was very high; it being the season of rainstorms, and it having then been raining for several days. While Slavens and Hughes were walking on the track several miles south of Castlerock, a freight train from the north overtook and passed them. Within a few minutes they heard the whistle of the engine for aid, and at once hurried forward to the assistance of the train. When they arrived they found that the train had been stopped by a slide from the high bank, consisting of soft, mushy ground, brush, and stumps. They at once began to remove the obstructions; being assisted in the work by the train crew, under the direction of the conductor. While so engaged, a second slide from the same bank occurred, which carried Slavens and Hughes into the river, resulting in the death of the former.

In her complaint, the plaintiff alleged that through its carelessness and negligence, and without the knowledge of the deceased, the defendant allowed the bank to become insecure and dangerous to its employés, including the deceased, who might be ordered or directed to work upon or adjacent to its track at the point in question; that the defendant ordered the deceased and Hughes to remove the obstructions from the railroad track with all possible speed, and carelessly and negligently failed to notify or warn the deceased or Hughes of the dangers incident to or attendant upon the removal of the obstructions; that it was very dark, and that the deceased and Hughes

were unable to see, and did not know, and could not by the exercise of ordinary diligence have known, the true condition of the bank, and were unaware of its insecure and dangerous condition; that it was the duty of the defendant to have employed a larger number of laborers to remove the obstructions, or to have watched the bank while the deceased and Hughes were removing them, and to have warned the deceased of the insecure and dangerous condition of the bank, but that the defendant wholly disregarded its duty in that behalf. The answer of the defendant denied all the allegations of negligence on its part, and, as an affirmative defense, averred that the deceased and Hughes were at the time of the accident, and for a long time prior thereto had been, in the employ of the defendant as section men and laborers, and that, as such, it was their duty to go over and along the track of the defendant at the place named in the complaint, and other places, for the purpose of inspecting and examining the road, to ascertain if any obstructions were upon the track, and to remove any found thereon; that the deceased and Hughes were fellow servants in such common employment, and that the deceased was familiar with the track and roadbed of the defendant at and near the place where the accident occurred, and for a long distance on each side of that place, and had frequently passed over and along the track in such employment; that Slavens knew of the manner in which the railroad was constructed, and the location and situation of all of its banks, and of the bluffs adjacent thereto, and that he could and did inspect the same, and that all danger of slides from the bank upon the railroad track was well known to him; that at the time of the accident there were severe storms of rain, and that Slavens knew that at such times there was danger of slides from the bank, and that he was employed to ascertain and discover such slides, in the event of their occurring, and to remove the same; that the slides in question were occasioned by the great quantity of rain which had previously fallen, and the condition of the earth, and that Slavens well knew these conditions, and, as part of his employment, voluntarily assumed the examination of the track and roadbed, and voluntarily assumed the work of removing such slides, and, in connection with his fellow servant, Hughes, did undertake to remove one of the slides mentioned; that the falling of the bank was the result of an accident, and did not occur through any fault or neglect on defendant's part in the construction of its road, or in any other way, and that all the dangers arising from the slide, or other condition of the bank or bluff, were open to the observation of Slavens, and were known to him; that he was familiar, and had been for years, with the locality, and with all the dangers which could or might arise by reason of the falling of the banks, or otherwise; and that he assumed all risk incident thereto by accepting the employment of the defendant and continuing to remain therein. The trial resulted in a verdict for the defendant, and the cause is brought here by the plaintiff by writ of error.

There was evidence to the effect that about 17 years prior to the accident a ditch was constructed on and along the bluff above the roadway, at varying distances from the rim of the slope of the bank,

for the purpose of carrying off the waters. There was evidence tending to show that at different times this ditch was cleaned out by the section men so as to admit of the passage of the waters, and that Slavens himself had sometimes been engaged in that work. There was also testimony tending to show that for some time prior to the accident it had not been cleaned out, and that it had become obstructed by leaves, logs, and trees, and that such obstruction resulted in so soaking the bank with water as to cause the slides in question. The first slide—and the one that caused the stoppage of the train, and the consequent calling, by the blasts of the engine, of the section men to its aid—was a small one, of some 10 or 12 feet in width, and a couple of feet in depth. When Slavens and Hughes came up to the train, they at once commenced shoveling the earth and débris from the track; and, finding a stump on the track, the engine was, under the direction of the conductor, hitched to it, and it was pulled off. The crew of the train had lanterns which threw what light they could, but the night was very dark. At the trial the conductor of the train was called as a witness on behalf of the defendant, and after testifying that Slavens and Hughes, upon coming up to the slide, looked it over, and then went to work cutting the brush and shoveling the dirt, while he held a lantern, that they might, by means of it and the headlight of the engine, see to work, was asked whether he had a conversation with Slavens while he was so engaged in the work, and, having answered in the affirmative, was permitted, against the objection of the plaintiff, to give this answer:

"I asked him if there was not danger of another slide coming down and putting us all into the river. He said, 'Yes,' and kind of laughed, smiled,—kind of joshing, we were. He said, 'Yes;' we would expect that at any time; that he had worked there before, and we could expect that at any time. I said, 'If that is the case, I guess I will move out of this mud, to where I can have safe footing.' "

The witness was then asked, and testified, as follows:

"Q. What did you do? A. I moved out. Q. What did he do? A. He went on working. I had hardly got out of the mud until I heard a crashing and a cracking, and started to run, and the slide passed right between back of myself and my brakeman. The brakeman was near me,—in the same vicinity. The second slide is the one that swept Mr. Slavens and Mr. Hughes into the river."

The action of the court below in permitting the conductor to testify to this conversation with Slavens constitutes the first ground relied upon by the plaintiff in error for a reversal of the judgment. The other grounds relied upon by the plaintiff in error, apart from the contention that the verdict of the jury was unsupported by and contrary to the evidence, grew out of the charge of the court to the jury. It was, in part, as follows:

"The degree of care and prudence which an employer owes his employé is that degree of ordinary care and prudence which a person of ordinary intelligence and prudence will naturally, and does usually, exercise for his own safety. It is the duty of an employer to have all the appliances for doing his work inspected, and kept in a condition fit for use, and so that they can be used with safety. And the place where an employé is set to work should be looked after, and, as far as may be, kept in a condition of safety, so that the men can work there with safety. It is not a rule which requires an employer

to do an impossible thing, or to insure the absolute safety of an employé against injury that may happen to him if he is set to work in a dangerous place. It is necessary for employers operating works in mountainous places or near rivers to employ men to do the very work that is necessary to make the places safe to the employés who engage in the service, and the employé who engages in that service assumes certain risks. Now, the risks which an employé does assume himself are of two classes: One class is that of those risks which are ordinarily incident to the employment in which he engages.— the ordinary risks which are incident to the employment the employé takes upon himself. The other class of risks are those which are known to the employé, or which are obvious, or should be known to him if he exercises due care for his own safety. If an employer has allowed his machinery or appliances to get out of repair, so that they are dangerous to handle, or sends an employé into a dangerous place, that might be safe if due care had been exercised, if that is a danger which is out of the ordinary, still the employé assumes that risk, if he voluntarily goes there with the knowledge that the danger exists, or if that danger is so obvious that in the exercise of his faculties he could know it. So that this defendant is not liable in this case for any result happening to Mr. Slavens for going to work in a dangerous place, if the evidence shows that the danger was simply the kind of danger that was necessarily incident to his employment, or if it was out of the ordinary; if it was a danger that was actually known to him, or was obvious to him,—that the risk was assumed by him,—and there is no liability of this defendant company in this case to pay damages. If, on the other hand, it appears to you from the evidence in the case that the defendant railway company was negligent, and that by reason of its negligence a danger existed, which was unknown or was not obvious to Mr. Slavens, and that, by reason of his being engaged in work exposed to that danger, the accident happened as a necessary result of the negligence of the company, so that that negligence can be considered as the proximate cause of the injury, then the defendant company is liable, and the plaintiff is entitled to a verdict at your hands for such damages as in your estimation will be reasonable compensation to her for the loss.

"The only wrongs that are charged on the part of the railway company, which can be considered by you in this case, are the particular wrongs which are mentioned in the complaint. The complaint charges that the railway company was negligent in allowing a bluff along which the track is situated, and along the bank of the Cowlitz river, to become in an unsafe and dangerous condition by reason of neglect on the part of the company, and the evidence in this case is directed to proving that the negligence—the particular negligence —consists in neglecting to keep open a ditch for drainage of the water out of the hill. That is the question which is submitted to the jury,—whether there was neglect on the part of the railway company in that particular; and, if you find that there was negligence in that particular, then you must go on and consider and determine the question whether or not that negligence was the cause of Mr. Slavens' death, and in that connection will take into consideration and account the fact that the slide—the landslide that occurred there before Mr. Slavens commenced to work at that place at removing the material from the track—was not the cause of his death. The slide that occurred before he went there is not of itself the cause of his death, and the danger created by reason of that slide was necessarily obvious to him. While he was at work, as the evidence shows, there was a further come-down of material from the bluff, and it was that which carried him out into the river. Now, the question for you to determine is whether the continuation of the sloughing of the bluff was caused directly or proximately by the failure of the railway company to keep the ditch open and free, so as to drain the water out of the hill.

"Another wrong that is charged in this complaint against the railway company is in not having a sufficient force of men at work in removing the earth and material from the track at that place, and to keep watch of coming danger to the men that were at work. Now, I instruct you, as a matter of law, in this case, the railway company is not liable for that neglect, and for this reason: Mr. Slavens necessarily had knowledge of any lack of a sufficient force of men to work, or of watchmen to give warning, at the time he went

to work, and there is no evidence that there was any such coercion exerted upon him that he was compelled to go there. He must be understood to have gone to work at that place at that time voluntarily, and with full knowledge on his part of any neglect of the company in not having a sufficient force of men there at that time, if, indeed, there was any such neglect, so that he must be understood as having assumed that risk. That is one of the risks or dangers that was known to him.

"Another charge against the company of wrong is in the failure to give Mr. Slavens warning of that danger. In the argument to the jury in this case, counsel have charged Mr. Cochran, the conductor of the freight train, with culpability in not warning Mr. Slavens that there was danger in working in that place. Now, it is clear that Mr. Slavens himself was as well informed, if not better informed, in regard to that danger, as was Mr. Cochran, the conductor who run the train. Also, the contention is made that for the time being, in the work of removing the material and earth from the track, he was the foreman of that work, and the representative of the railway company, and acting in the capacity of a vice principal. There is no more reason for supposing that he had knowledge of the condition of things on the bank above, that were out of view from the track, or that he knew of the existence of any basin or gathering of water upon the hill above, or of there being an insufficient drain, than that the trackmen who walked the track had such knowledge. That ground for charging the railway company with neglect (that is, failure on the part of Mr. Cochran to warn him of any danger) is not sufficient. The question that is submitted to you goes back of that, and it is for you to consider whether there was any neglect on the part of the railway company to have in a superintending position a man competent to keep watch of the condition of the right of way, and to give warning of any known dangerous condition by reason of a lack of proper drainage, and whether there was on the part of the defendant any failure to properly inform the men who were required to go to work, when suddenly called upon in the nighttime, of any peculiar or unusual condition of things that would be liable to result in an injury to them. If the rules of the company had made it the duty of the roadmaster or foreman of the section gang, and either one of those officers neglected that duty, you may consider that as a question to be decided in this case,—whether or not there was in that particular a failure to give warning which would amount to a breach of duty on the part of the railway company to exercise ordinary care and prudence in warning its employés against dangers that were unknown to them."

The conversation between the conductor and the deceased was objected to on two grounds: First, because of statutory incompetency; and, secondly, because of irrelevancy and immateriality.

By section 858, Rev. St., it is provided that:

"In the courts of the United States, no witness shall be excluded in any action on account of color, or in any civil action because he is a party to, or interested in the issue tried: provided, that in actions by or against executors, administrators, or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with, or statement by, the testator, intestate, or ward, unless called to testify thereto by the opposite party, or required to testify thereto by the court. In all other respects the laws of the state in which the court is held shall be the rules of decision as to the competency of witnesses in the courts of the United States, in trials at common law, and in equity and admiralty."

A statute of the state of Washington provides that:

"No person offered as a witness shall be excluded from giving evidence by reason of his interest in the event of the action as a party thereto, or otherwise: but such interest may be shown to affect his credibility; provided, however, that in an action or proceeding where the adverse party sues or defends as executor, or administrator, or legal representative of any deceased person, or as deriving right or title by, through, or from any deceased person,

or as the guardian or conservator of the estate of any insane person, **or of any minor** under the age of fourteen years, then a party in interest, or to the record, shall not be admitted to testify in his own behalf as to any transaction had by him with, or any statement made to him by any such deceased or insane person, or by any such minor under the age of fourteen years." **2** Hill's Code, § 1646.

Even if the exception to the general rule declared in the United States statute above quoted could be extended by any act of a state,— which cannot be done (Potter v. Bank, 102 U. S. 163; King v. Worthington, 104 U. S. 44; Goodwin v. Fox, 129 U. S. 601, 630, 631, 9 Sup. Ct. 367),—still the statute of the state of Washington did not render the witness incompetent, for the simple reason that the conductor was not a party to the record, nor, in any legal sense, interested in the case. The conversation testified to by him was clearly a part of the res gestæ, and both material and relevant. "Declarations which are the natural emanations or outgrowths of the act or occurrence in litigation," said the court in the case of Railway Co. v. Buck (Ind. Sup.) 19 N. E. 453, "although not precisely concurrent in point of time, if they were yet voluntarily and spontaneously made so nearly contemporaneous as to be in the presence of the transaction which they illustrate and explain, and were made under such circumstances as necessarily to exclude the idea of design or deliberation, must, upon the clearest principles of justice, be admissible as part of the act or transaction itself." The declarations of the deceased, as testified to by the conductor, tended to show that he was apprised of the dangerous position in which he was working. But it is contended on the part of the plaintiff in error that the conductor ordered the deceased into this place of danger, and in doing so stood in the place of the railroad company, that there was a hidden danger in the bank, and that as it would have been the duty of the master to have warned the deceased of such hidden danger, if personally present, directing the work, it was equally the duty of the conductor. This contention is based on rule 460 of the defendant company, which declares, as has been seen, that "foremen, and men in their employ, must at all times hold themselves in readiness to aid the passage of trains, and, in case of accident or delay, will obey the orders of the conductor." This rule provides for emergencies. It was no part of the duty of the conductor to know anything about the ditch on the bluff, or the condition of the bank. In the nature of things, he could not know as much about their safety as the deceased, to whom, in part, their care was expressly committed by the company's rules under which he was working. By rules 455, 461, and 472, the duty of keeping in order the road, right of way, etc., was imposed upon the roadmaster and section men, each of whom was a fellow servant of the deceased, and for whose neglect the company was not answerable. At most, the conductor, in the matter in question, was a mere temporary boss; and even if it be conceded that it was his duty to have gone upon the bank and bluff, and reported their condition to the deceased, his failure to do so would likewise be the negligence of a fellow servant, for which the common employer is not responsible. Mining Co. v. Whelan, 168

U. S. 86, 18 Sup. Ct. 40; Martin v. Railroad Co., 166 U. S. 399, 17 Sup. Ct. 603, and cases there cited.

It is also contended on the part of the plaintiff in error that the court below erred in instructing the jury that the defendant company was not liable for its alleged failure to have a sufficient force of men to remove the obstruction from its track, and to keep watch of danger to the men that were at work. There was no evidence of any failure on the part of the company to furnish all the men that were needed for the proper operation and protection of the road, including the proper protection and preservation of the bank. On the contrary, the testimony of the foreman of the section on which the accident occurred was to the effect that he was given as many laborers to perform section duty as he required; that on the night of the accident he sent out the number of men he thought necessary to perform the requisite duty, which they were doing in the ordinary and customary way at the time the slide in question occurred. It was usual, according to the evidence in the case, for the foreman to send out the track walkers in pairs, which was done on that occasion. Slavens and Hughes knew that they constituted the usual force, and when they were called to the assistance of the train, and found it impeded by a slide, it was their duty to inquire into their surroundings, and they must be held to have assumed the risk of the situation in which they voluntarily placed themselves. Tuttle v. Railway Co., 122 U. S. 189, 7 Sup. Ct. 1166; Southern Pac. Co. v. Seley, 152 U. S. 145, 14 Sup. Ct. 530; Railway Co. v. Jackson, 12 C. C. A. 507, 65 Fed. 48, and cases there cited.

We would not be justified in holding the verdict contrary to the evidence, and are of the opinion that the plaintiff in error has no just ground to complain of the instructions of the court below. The judgment is affirmed.